May it please the Court, Anne McClintock on behalf of Jeffrey Biggs, who is here in court. And until you start asking me questions, there are two points that I want to address regarding the Ex Pes Facto claim as it applies to California's gubernatorial parole review process law, Prop 89. And that's to make the distinction between the factual allegations that Mr. Biggs made in his State Petition in contrast to the facial challenges, the allegations that were made in the cases that Rosencrantz, the State Supreme Court decision made, which was the one that the Superior Court relied on in denying him relief. And in Biggs' State Petitions throughout the whole process, what he alleged was, was that the Prop 89, as the Governor actually used it, was not neutral. That it was inequitable and that it had the effect that it had never been used to review a denial of parole. And it distinguishes and really gives the State Courts notice that he's making an as-applied challenge, which is where the Garner decision comes in and where the Rosencrantz. Okay, so what evidence did you amass? What, in Federal Court or in State Court? In Federal Court, our amassing has continued since this case got dismissed. But right now, I can say that I believe that we could prove that as of 2006, something on the order of 70 percent of the cases reviewed by the Governor resulted in reversals of parole, of grants of parole resulted in reversals. And how does that change the sentence? It changes the focus in Garner and in Morales' and in the earlier cases, and even in Dobert, is not the sentence, but whether the term of imprisonment has been lengthened. And in simple cases where you're talking about a determinate term, you would look at a sentence. But where you're looking at a life term with possibility of parole, what the Supreme Court has told us in Garner is that you have to be careful. But what if you had a law and order Governor who came in and had the opportunity of reappointing the parole board and appointed similarly-minded parole board members? And you could show that this parole board was far more hard on parolees than the prior boards? I think that's happened. I mean, if you look at the the And that gives you a constitutional claim under Garner? What the Supreme Court has held in cases If you start with the yes or no and then explain, it really helps us No. Okay. No. When it's the same body and it's the same standard that's being applied, the fact that a more conservative or more cautious group comes in, that doesn't create an ex post facto problem. What happens is when you've added a layer and its actual implementation of that added layer creates a significant risk of increasing terms in an ex post facto violation. Since the Governor can only disapprove, that is, I don't believe the Governor can overrule the parole board if the parole board decides to turn down a request for parole. That's not right. That's not correct? That's not correct. The Governor can overturn it? Right. And that's what Johnson relied on in some of the other cases in the facial challenge, is that the Prop 89 language is neutral. It says the Governor may affirm, modify, or reverse. So he can agree, he can affirmatively agree with a board decision whether it's a granted denial. He can change it. So whether you get, so the statistics that you're going to be able to amass will depend on whether you've got a law and order Governor or not. So if you had a more liberal Governor with respect to this who was reversing a parole board that turned out to be very conservative, very law and order, then you would be just fine with that or it would not be a violation of the ex post facto laws. But if you elect a conservative Governor the next time, then you do have an ex post facto violation. Well, I think you have to look at it in total of what happens generally. I think you have to focus not on the individual decision maker, but how the proposition is being used. And what we have found is that over the course, if you look at from 1991, which is when Prop 89 was first implemented, certainly through Mr. Biggs' decision in 2005 or 6, or even up to the end of beginning of Governor Brown's second term, that the overall statistical reversal rate is pretty much the same. There's some variation, but it's 65, 70 percent. It's in that range. And it's remarkably steady. There are acute years where you see, if you just look at the numbers, like under Gray-Davis, where it's basically zero percent of people are getting out. But if you look at actually the reversal rate long term over the 20 or so years that this has been utilized, it's about 70 percent of board denials are being reversed. That no board, I mean, sorry, board grants on this book. Okay, 70 percent of grants are reversed. Are reversed. No board denial is reversed. Only three total, so it's essentially zero percent of board denials are even looked at. And there are a couple of them. Even looked at. But the Governor issues any kind of decision regarding. That doesn't mean it didn't look at it. Well, the Governor, under the proposition and under the enabling statute, is supposed to report to the legislature on his actions underneath Prop 89. So we have to look at. Actions. Well, that's been, consistently it's been modifications, affirmances or denials. He may not give a blank explanation, but he'll give a listing of declined to reviews as the language they've used. But he doesn't say he didn't look at it. He's got staff there to look at these things. Well, what the discovery has indicated with. Discovery. The discovery. We were permitted discovery in this case, two rounds of discovery. And there's further discovery that has been going on in the Gilman 1983 class action on this and a separate challenge. And what the discovery in that case has shown is that the only information that the board, who are the holders of all what's happening with these folks, that the Board of Parole hearings sends to the Governor is information about board grants. So there's no basis for thinking that unless there's some special case where the person has indirectly petitioned the Governor through letter or however, that the Governor is looking at anything other than board grants. Did you make this claim in the California courts? He did. He did. Okay. Did you take it to the California Supreme Court? Yes, he did. Okay. Got a postcard denial? He got a, he made a petition for review and was summarily denied. Did you file for cert? He did not. Okay. Why not? If, if we went along. Sorry. I thought it was coming from there. Sorry. If we went, no, it's up here. No. If we went along with you, would we have some problem with a mallet case? It strikes me that all is not directly in point. The Supreme Court would say, well, can't you apply that case to this situation? We told you no additional tier. We meant no additional tier. A mallet, I think, is different because it's not, it's a, it's a trial appeal right. Right. I understand that. Right. But, but it strikes me that the case itself indicates the Supreme Court is not going to pay much attention to putting an additional tier on, based upon their reasoning in that case. I understand it's not in point. I just wondered what your take is on how the Supreme Court would act towards this, based upon what we know of their jurisprudence so far. Well, I wouldn't be optimistic about what the current Supreme Court's jurisprudence on this would be, personally, but I. No, I can't. I'm not asking you to ask for, about personalities that the newspapers write about certain justices. I'm talking about cases they've decided. Well, I think given what Garner focuses on is of the, the practical implementation of a change, that, that there is room to believe that mallet would be limited to its context, that it's, we're adding an appellate right that is focused on process and is not focused on changing, it's not, it's something that's risking an increased term for someone. And you see that in Doebert, where you've added a layer in sentencing with the, that in death penalty, where originally it was just the jury makes the determination, and then they've added a layer of the judge making the final determination. And the Supreme Court looked at that as, substantively analyzed it as a, whether it was a due process violation. And under the facts of that case, because it had an ameliorative effect, generally, that their experience under this law was that more people were being, having a death sentence mitigated to life than Mr. Doebert, Doebert's, excuse me, situation, that it was not something that was significantly risking an increase in term. Ms. McClintock, what would be this Court's bottom line, in your view, if we adopted your position? What would we say? I think that we'd have to, to follow Garner, and that we have to look at the practical implementation, that the Rosencrantz's, application of Rosencrantz to Mr. Bigg's as-applied challenge was an unreasonable application of clearly established Supreme Court precedent, which was Garner, and that we need to vacate the decision and remand it, and let us put on the evidence that we've got it. It goes back to my question about, about filing for cert. Because if you file for cert, then you've got direct review in the Supreme Court under, under a very different standard than we have. If you, if you, if you take a direct appeal from a Rosencrantz-type case to the Supreme Court, you can just argue that the sixth, that the Ex post facto clause bars it. Right. You come to us, you have to argue, you have to argue that it's wildly wrong, not just simply wrong. Well, it's objectively unreasonable. It's the standard. I wasn't counsel when it was going on. I mean, there are lots of calculations, and I think for a lot of pro se prisoners, they don't view the Supreme Court cert petition process as a viable option. They'd rather get the district court. And at the time, I know my time is racing away, but at the time, there was still this case also involved a due process challenge, which was still viable at the time. It was precook. And so I think those things, balancing those couple issues that he had pending, that he explained why he came to district court. Okay. I've taken a good deal of your time. I'm going to allow you another minute for, for rebuttal. Thank you. May it please the Court. My name is Crystal Lee Pollard. I'm for appellee secretary, because Mr. Biggs is on parole. He's no longer incarcerated. Your Court's, the Court's questions have revealed the weakness, the fundamental weakness in Mr. Biggs' argument. This was not a change in the quantum of punishment. It was just a change in who decides parole. His sentence remained the same. It was life. When he could be considered for parole remained unchanged. The only change was who makes the decision. And then when this Court looks at the Supreme Court authority out there, there is nothing on point. Garner's not exactly on point. There are no cases exactly on point. So the state courts needed to resolve the Supreme Court authority that was out there. And they adopted a view that this kind of change was more like the Mallett case, and therefore not within the scope of the ex post facto clause. And so they found that Garner was inapplicable. Ms. McLintock said that the governor can reverse a denial of parole. Is that the state's view as well? Yes, Your Honor. The governor can. Has the governor ever reversed a denial of parole? There's nothing in the record that shows that the governor has done that. You know, the governor can do that, but that would be a, each case is a case by case decision. These are not... Is there anything in the history of the Prop 89 that suggests that there was some dissatisfaction with the parole board or that there was a feeling that the governor ought to be some kind of a regulatory backstop to prevent more people from getting out of jail? I'm not sure whether or not what the motivation behind what may have been in a group decision and gives it under to review for an individual. So it goes from the Board of Parole Hearings and then it gets a second look. That's all this is, is a second look. It's not... It's a second look, but the assumption is that it'll be timely, that is, reasonable time. Suppose the second look was 10 years later, that the governor had plenty of time to do these things that may interfere with reelection. Suppose it extended the opportunity for the person to be on parole earlier. Is that a consideration in determining our case? It could be, but in this case, it's a very short window of time. It's only 30 days. And so we're not getting into a period where there's a long delay between when the person was either found suitable or unsuitable and the governor chooses to act on that decision. It's a very short window of time. And again, going back to the EDPA analysis... But if that's true, then it isn't necessarily true that an additional layer of review would never violate the Constitution, which you're saying in this case, because there's only a 30-day time limit, that it's not reasonable that it will. Yes, Your Honor. I don't believe that having a very short window of time for a second look at a decision is the kind of change in the quantum of punishment that falls within the scope of the ex post facto clause. And there is some Supreme Court authority that supports that conclusion. And again, because this case is reviewed under EDPA, the question is not whether or not the State's analysis is persuasive. It's whether it is, as you're in the Justice's words, whether it's wildly unreasonable. And again, there is Supreme Court authority in support of the State court's position. So therefore, Mr. Biggs cannot state a claim under the ex post facto clause. Does the Court have any other questions? I don't think so. Thank you, Your Honor. There are just two points that I want to make from what I just heard. There's a suggestion, and perhaps I misunderstood it, that the 30-day time frame which the Governor would act implicates that there's no significant increase in terms. And the fact that he acts within a short period of time is irrelevant to the actual effect on people's terms. I think the question went to the problem that was raised in some of the other State cases in which the parole boards decided they wouldn't review somebody for, rather than every year, every three years. But the deferral period is between close. Right. That's right. So if the Governor is sitting on something for five years, that might actually change. It might implicate some of those prior cases. Right. The only thing that I want to follow up on that is, because Judge Bybee, you had asked me a question about what we found in our investigation and discovery, is the follow-up is that when we tracked, and this isn't part of the record, but it's something that we need to get back to district court to be able to prove, is that when we tracked what actually happened to individuals whose paroles had been reversed by the Governor, in 90 percent of those cases, they served a much longer, significantly longer term. Did you say that's not in the record? No, because we got thrown out before, while we were still in the midst of, we had gotten discovery and we were still in the midst of investigating. It sounds self-obvious, though. If the Governor is reversing parole decisions, somebody is going to serve longer time. In some of the earlier cases, when the board was granting parole at a higher percentage, I mean, before Governor Davis, basically the percentages ranged from 5 to 10 percent, usually about 7 percent of people who came to the board were granted parole. And in those times, the parole grants were much earlier or had several years before the person actually finished their term. So they weren't immediately subject to release. That has changed. So in the people, someone in like Mr. Bigg's case, he had, he actually had, I think when he was first granted parole, another year or two to serve. That's not the case in the bulk of the cases these days, where they've overstayed from their perspective their time in prison by the time they finally get their grant. The other point I wanted to make regarding Prop 89 is that there was a question about what his motivation was. And if you look at the literature in the proposition, it is clearly intended to restrict parole grants because of a perception that the board was being too lax. The only follow-up to that is that the Governor always had pardon authority before this. So it didn't have an effective military effect that he didn't already have the power to do. With that, I submit. Thank you. Roberts. Thank you very much. Thank counsel for the argument.
judges: Wallace, Farris, Bybee